IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * * * * *    C.R. NO. 20-89-JJM
                                *
UNITED STATES OF AMERICA        *
                                *
    VS.                         *    NOVEMBER 5, 2020
                                *    9:00 A.M.
MANISH KUMAR                    *
                                *
* * * * * * * * * * * * * * * *    VIA VIDEOCONFERENCE
```

BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

CHIEF JUDGE


(Arraignment and Change of Plea)


APPEARANCES:

FOR THE GOVERNMENT:    MILIND M. SHAH, AUSA
                       U.S. Attorney's Office
                       50 Kennedy Plaza
                       Providence, RI   02903

FOR THE DEFENDANT:     KENSLEY R. BARRETT, ESQ.
                       Law Office of Kensley R. Barrett
                       127 Dorrance Street, Penthouse
                       Providence, RI   02903

Court Reporter:        Karen M. Wischnowsky, RPR-RMR-CRR
                       One Exchange Terrace
                       Providence, RI   02903

5 NOVEMBER 2020 -- 9:00 A.M.

THE COURT: Good morning, everyone. We're here today in the case of the United States versus Manish Kumar, Criminal Action Number 20-89, and we're here for a combined hearing of an arraignment on an Information and a change of plea on that.

Would counsel identify themselves for the record, please.

MR. SHAH: Good morning, your Honor. Milind Shah for the United States.

THE COURT: Good morning, Mr. Shah.

MR. BARRETT: Good morning, your Honor. Ken Barrett on behalf of Mr. Manish Kumar.

THE COURT: Good morning, Mr. Barrett.

Good morning, Mr. Kumar.

THE DEFENDANT: Good morning, sir.

THE COURT: Mr. Kumar, would you stand up now, and Ms. McGuire's going to swear you in.

(Defendant sworn)

THE CLERK: Please state your name for the record and spell your last name.

THE DEFENDANT: Manish, last name spelled as K-U-M-A-R.

THE CLERK: Thank you. You may be seated.

THE DEFENDANT: Thank you.

THE COURT: Mr. Kumar, you're now under oath, and that requires you to give me truthful answers to the questions I ask. If you fail to give me truthful answers, further charges like perjury or giving a false statement or other charges can be brought against you. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. If I ask you a question that you don't understand, just ask me to explain it further and I'd be glad to. And if at any time you need to discuss a matter with your attorney, we have a provision for a breakout room where you can have a totally confidential conversation with your attorney.

So all you need to do is ask for that, and we will provide that. Do you understand that as well?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Mr. Kumar, we're conducting this hearing today via video. We're using the Zoom platform with you and Plymouth County and everyone else remotely.

We're doing that because of the pandemic and the Court's finding that it is not safe to bring people into the courthouse. You have a right to actually have these hearings be held in person, but the Court is not able to do that right now.

My understanding is that you've agreed to allow us to proceed via video and that you've waived any right that you have for these hearings to appear in person. Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: And did you discuss that with your attorney and did he answer all of your questions about that and is he in agreement with you that we should proceed via video?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Is that true, Mr. Barrett?

MR. BARRETT: That's correct, your Honor.

THE COURT: Okay. Great. So we're here first for an arraignment on a seven-count Information that's dated October 20th, 2020. Before we talk about the Information, Mr. Kumar, I need for you to understand certain important rights that you have.

The first right you have is the right to remain silent. That means that you're not required to make any statement about anything or anyone with regard to this matter. In fact, if you begin to speak, you can stop at any time and assert your right to remain silent. However, if you do say anything, anything that you say can be used against you.

Do you understand your right to remain silent?

THE DEFENDANT:  Yes, sir.

THE COURT:  You also have a right to counsel at every step of the proceeding.  Now, you have a right to hire a counsel of your own choice as you have so far here with Mr. Barrett, or if you cannot afford counsel, you may apply to the Court and the Court will appoint counsel for you.  Do you understand?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  My understanding is that you wish to proceed with your own retained private counsel, Mr. Barrett; is that correct?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Now, you have a right to have your counsel present with you any time that a representative of the Government is questioning you.

To exercise this right, all you have to do is simply say, I want my attorney, and then the Government would have to stop questioning you and would not be able to speak with you without your attorney present. Do you understand that as well?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  So you're here because the United States has brought an Information against you charging you with seven counts.

Count I is a conspiracy to commit wire fraud,

Counts II, III, IV and V are for wire fraud, and Counts VI and VII are for identity theft.

Now, Mr. Barrett, have you and your client received a copy of the Information?

MR. BARRETT:  Yes, we have, your Honor.  I mailed Mr. Kumar a copy, and I believe the facility provided a faxed copy yesterday.

THE COURT:  Is that true, Mr. Kumar?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Great.  And, Mr. Barrett, have you reviewed the charges with Mr. Kumar?

MR. BARRETT:  Yes, I have, your Honor.

THE COURT:  And do you believe that Mr. Kumar understands the nature of the charges contained in the Information?

MR. BARRETT:  Yes, I do believe so, your Honor.

THE COURT:  Mr. Kumar, as I said, the Government has charged you with a conspiracy that took place in the District of Rhode Island that involved wire fraud and identity theft.

Do you understand the charges that the Government has brought against you as outlined in the Information?

THE DEFENDANT:  Yes, sir.

THE COURT:  Now, I also understand that you wish

to waive your right to have your case presented before a grand jury.

Mr. Barrett, have you reviewed this issue with your client?

MR. BARRETT: Your Honor, we have discussed the fact that he has an opportunity to have his case go in front of a grand jury. We discussed the possibility for an Indictment, and I believe that Mr. Kumar has indicated that he wishes to proceed without an Indictment.

THE COURT: Okay. And, Mr. Kumar, did you have that discussion with your attorney?

THE DEFENDANT: Yes, sir.

THE COURT: And did he answer all of your questions about the grand jury and an Indictment and an Information?

THE DEFENDANT: Yes, sir.

THE COURT: I want to just briefly explain to you again to make sure that you do understand what rights you're waiving here.

So you have a right under the Constitution to have your case presented by the Government to a grand jury. A grand jury is made up of at least 12 people who will sit and hear the evidence that the Government has against you to determine whether there's probable

cause to charge you by way of an Indictment.

Now, if the grand jury were to hear all of the Government's evidence and if the grand jury were to determine that there was not probable cause to bring the charges or any one of them against you, then you would not be charged at all. The Government could not charge you with all or the particular crime where they did not find probable cause.

So if you waive your right to have your case presented to a grand jury, you're giving up the opportunity that the grand jury will come back with a finding of no probable cause.

Do you understand what rights you're waiving by giving up your right to have your case presented to a grand jury and to be charged by way of Indictment?

THE DEFENDANT: Yes, sir.

THE COURT: And based on that explanation and on the discussions that you had with your attorney, is it your -- still your decision that you wish to give up your right to be indicted by a grand jury?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Mr. Kumar, did anyone make any threats to you to induce you to waive your right to an Indictment by a grand jury?

THE DEFENDANT: No.

THE COURT: Did anyone make any promises to you in order to get you to waive your right to an Indictment by a grand jury?

THE DEFENDANT: No.

THE COURT: Did you understand that? You looked a little quizzical, Mr. Kumar.

THE DEFENDANT: I didn't get the question, sir.

THE COURT: Okay. So has anyone made any promises to you that they would do something in exchange for you waiving your right to have your case presented to a grand jury?

THE DEFENDANT: No.

THE COURT: No promises were made?

THE DEFENDANT: Yes.

THE COURT: Okay. This Court finds that your waiver of a right to an Indictment by a grand jury is made voluntarily and knowingly.

And, Mr. Kumar, with your permission and with your counsel's permission, the Court has a waiver of Indictment form that -- Vickie, can you put it up on the screen.

Mr. Kumar, I'm going to ask you to read this form and have your attorney read this form and then ask your permission if you're in agreement with the form to allow the clerk to sign your name and the same to

Mr. Barrett with the clerk signing it. Can you read that, Mr. Kumar?

THE DEFENDANT: Yes, sir. (Reading) I understand that I have been accused of one or more offense punish by imprisonment for more than year. I was advised in open court of my rights and the nature of the proposed charges against me. After receiving this advice, I waive my right to prosecution by Indictment and consent to prosecution by Information.

THE COURT: Do you agree with that waiver of Indictment, Mr. Kumar?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do you authorize Ms. McGuire as clerk of the court to sign your name in agreement with that Indictment -- with that waiver?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Barrett, the same question to you.

MR. BARRETT: That's correct, your Honor, I do.

THE COURT: Okay. So with permission of both Mr. Kumar and Mr. Barrett, Ms. McGuire will sign the waiver of Indictment form, indicate that she's signing it with their consent and file that on ECF on the record.

Now, there is no plea agreement in this case; is

that correct?

MR. BARRETT: That's correct, your Honor.

THE COURT: Okay. Mr. Kumar, how old are you, sir?

THE DEFENDANT: I'm 32, sir.

THE COURT: Thirty-two. And how far did you go in school?

THE DEFENDANT: I graduated.

THE COURT: From what level of education?

THE DEFENDANT: Bachelor's. Bachelor of Arts.

THE COURT: Great. And have you been treated recently for any mental illness or addiction to narcotic drugs?

THE DEFENDANT: No, sir.

THE COURT: And as you sit here today, are you under the influence of any drugs, medication or alcoholic beverages of any kind?

THE DEFENDANT: No.

THE COURT: Mr. Kumar, are you fully satisfied with the representation that you've received from your attorney, Mr. Barrett?

THE DEFENDANT: Yes.

THE COURT: Okay. Now, before I ask you about your change of plea, Mr. Kumar, I want to explain to you certain rights that you have under the Constitution

and laws of this country.

You have a right to plead not guilty as you have so far in this case, and you can continue to plead not guilty throughout all of the proceedings.

If you were to continue to plead not guilty, you'd be entitled to a trial by a jury. At the trial you would be presumed to be innocent and the Government would have to prove each and every element of the charges it brings against you beyond a reasonable doubt.

You would have a right at that trial to see and hear, confront and cross-examine and have your lawyer cross-examine all of the witnesses and the evidence that the Government would put on in order to prove its case against you.

Also at that trial you would have a right to put on a defense. In fact, you could subpoena people, that is, require them to come to court and testify in your defense.

You would also have a right yourself to testify at that trial in your own defense if you wanted to; but, more importantly, you would not have to testify. You could not be forced to testify. And if you chose not to testify, the jury could not in any way, and would be told so, they could not use that in any way

against you.

But if you change your plea to guilty today, Mr. Kumar, you're going to give up all of these rights that I just told you about and there will be no jury trial.

Do you understand that you have these rights and that if you change your plea to guilty today you'll give up these rights?

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone in any way attempted to force you to plead guilty or otherwise threatened you in any way to get you to plead guilty to these seven charges?

THE DEFENDANT: No, sir.

THE COURT: Has anyone made any promises or assurances to you of any kind in order to get you to plead guilty?

THE DEFENDANT: No, sir. No.

THE COURT: So are you knowingly and voluntarily changing your plea to guilty today because you believe it's in your personal best interest now to do so?

THE DEFENDANT: Yes, sir.

THE COURT: Now, Mr. Kumar, I want to tell you about the maximum penalties that the Court could impose at the time of sentencing.

Now, as to Count I, the maximum term of imprisonment is 30 years, the maximum fine is $250,000, five years of supervised release and a $100 mandatory special assessment.

As to Counts II, III, IV and V, as to each of those four counts, the maximum term of imprisonment for each count is 20 years, the maximum fine for each is $250,000, three years of supervised release and a $100 mandatory special assessment.

Now, Counts VI and VII that are the aggravated theft counts come with a mandatory two years of imprisonment to be followed by whatever sentence the Court gives on the other counts, in addition a maximum fine of $250,000, three years of supervised release and a $100 mandatory special assessment.

Now, if the Court were to impose the maximum sentence as to each of the seven counts and if the Court were to require that they be run consecutively, that means one after the other, then the maximum term of imprisonment is 114 years, the maximum fine is $1,500,000, up to 20 years of supervised release and a $700 mandatory special assessment.

Do you understand, Mr. Kumar, that these are the maximum penalties that the Court could impose at the time of sentencing in this case?

THE DEFENDANT: Yes, sir.

THE COURT: And do you also understand that Counts VI and VII carry with them a mandatory minimum, that is, two years to be served consecutive to whatever sentence the Court imposes as to Counts I through V? Do you understand that as well?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Now, you're not a U.S. citizen, are you, Mr. Kumar?

THE DEFENDANT: No, sir.

THE COURT: Okay. Have you discussed what a guilty plea to these felonies might do to your residency and your status with immigration authorities with your lawyer? Have you discussed that with your lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: And do you understand that if you plead guilty to these felonies, that you're very likely to be deported? Do you understand that as well?

THE DEFENDANT: Yes, sir. I would like to get deported.

THE COURT: I understand that from your counsel. Let me just look real quick. Are there forfeiture allegations?

MR. SHAH: There are no forfeiture allegations,

your Honor.

THE COURT: Okay. Great. Thank you.

So, Mr. Kumar, let me explain to you how the Court will determine what an appropriate sentence is for your case. At some point after this hearing, the Probation Department will come out and they'll interview you. They'll probably do it over Zoom or some other video capability.

You have a right to have your lawyer present or on that Zoom with you when probation interviews you, and it's very important that your lawyer is present with you for that interview.

After they conduct the interview and further investigation, they'll prepare a presentence report. That's going to be a report that gives me a lot of information about your background, any criminal history, personal information, information about the crime and other information that's very helpful for me to determine what an appropriate sentence is in your case.

Now, it will also, importantly, calculate the advisory guideline range. Those are guidelines that help the Court determine what an appropriate sentence is in your case.

Now, your lawyer may have calculated what he

thinks the guideline range will be or the Government may have even told your lawyer what it believes the guideline range would be and your lawyer told you that.

None of that's binding on the Court. I'm not going to determine your guideline range until after the presentence report is issued, both sides have a chance to object to it, I rule on those objections and in about two-and-a-half months at the time of sentencing, that's when I'll determine what your guideline range is.

Do you understand as we sit here today that the Court has not yet determined what your guideline range will be?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I'm going to ask Mr. Shah now to tell us what the elements of the seven counts are that the Government has brought against you and then to tell us what facts the Government intends to prove if this case were to go to trial.

Mr. Kumar, pay particular attention to the facts because at the end of it I'm going to ask if you admit the facts as stated by the Government as true. Okay?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Shah.

MR. SHAH: Thank you, your Honor. Beginning

with the wire fraud charge -- excuse me, the conspiracy to commit wire fraud, that charge has two elements. The first is that two or more persons in some way or manner agreed to try to accomplish a common and unlawful plan to commit fraud as charged in the Indictment.

The second element is that the Defendant, Mr. Kumar, knew that the unlawful purpose -- knew of the unlawful purpose of the plan and willfully joined it.

Counts II through V are wire fraud. There are four elements for wire fraud. They are, first, there was a scheme substantially as charged in the Indictment to defraud or to obtain money or property by means of false or fraudulent pretenses; second, the scheme to defraud involved the misrepresentation or concealment of a material fact or matter or the scheme was to obtain money or property through a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter.

The third element is that the Defendant knowingly and willfully participated in this scheme with intent to defraud; and, finally, fourth, for the purpose of executing the scheme or in furtherance of the scheme, Defendant caused an interstate wire

communication or an international wire communication or it was reasonably foreseeable that for the purpose of executing the scheme or in furtherance of the scheme an interstate or international wire communication would be used.

Counts VI and VII are aggravated identity theft. The elements for those are that the Defendant knowingly transferred, possessed or used, second, without lawful authority, third, the means of identification of another person and, finally, all of that was done during and in relation to an enumerated offense, namely either the wire fraud discussed earlier or the conspiracy to commit wire fraud that was discussed earlier. Those are the elements of the offenses.

Your Honor, were this matter to proceed to trial, the Government would establish -- the evidence would establish the following. And before I go into that, let me just define two terms, tech fraud and refund fraud.

Tech fraud is a type of telemarketing fraud that misleads victims into believing that malware or viruses have been detected on their computers, and that information is used to induce them to part with funds believing that they are paying for computer protection services.

Typical in this type of fraud, a call center operator conducts communications with the victim and engages in the fraud with the victim, namely by misleading the victim.

Refund fraud is also a type of telemarketing fraud. And with that sort of telemarketing fraud, funds are obtained from the victim, usually a victim of tech fraud, by, first, misleading the victim to believe that he or she has been issued money in excess of a promised refund and, second, having the victim send that excess to those engaged in the fraud to supposedly make the party who supposedly sent the money whole.

Critical to refund fraud is that no money is actually ever sent to the victim; and, therefore, when the victim thinks that he or she is sending excess money back, in fact the victim is sending back nothing but is, in fact, sending money from his or her account directly to the fraudsters.

With those general definitions in mind, were this matter to proceed to trial, the Government's evidence would establish the following: Beginning on March 8th, 2019, and continuing to August 25th, 2019, Defendant was generating for himself and others fraud proceeds from knowingly furthering tech fraud and refund fraud schemes and additionally was attempting to

generate for himself and others fraud proceeds from a credit card fraud scheme, which basically involved obtaining funds through the placement of fictitious bills on victims' credit cards.

Since March 8th, 2019, and continuing to August 25th, 2019, Defendant engaged, in concert with others, including call center operators and employees, in an effort to engage tech fraud.

And his activities included directing pop-up ads that were in furtherance of tech fraud to the public and having victim calls directed to call centers that operated in India and, second, having the proceeds from that fraud directed to third-party bank accounts in the United States for subsequent distribution to the Defendant and his co-conspirators.

Also since March 8th, 2019, and continuing to August 25th, 2019, Defendant, in concert with others, engaged in refund fraud; and his activities there included having call center operators telephone victims who had previously fallen prey to tech fraud and having -- or providing those call center employees and managers bank accounts to which refund fraud proceeds from victims could be routed and then transferred to the Defendant and co-conspirators.

The Government's evidence would additionally

establish the following specific facts, and I'm reading at this point paragraphs 19 through 34 of the Information.

On or about March 8th, 2019, Defendant Kumar obtained money routing services from a person whose name is represented as AB and that Defendant Kumar agreed that he and AB would retain and evenly divide amongst themselves a portion of the funds that were routed to the account that AB provided.

The accountholder of that account would retain a portion of the funds, and the remainder and majority of the funds would be routed by the accountholder to the call center responsible for obtaining the wire transfer.

On March 8th, 2019, AB sent to Defendant Kumar a text message containing bank name, account number, routing number and address for Account Number 1, a bank account that was being used for money routing.

On or about March 8th, 2019, one of Defendant's co-conspirators, a call center operator, obtained remote access to a victim who will go by the name LB, obtained remote access to LB's computer and offered LB a $400 refund and then misled LB to believe that LB had been issued a $4,000 refund by mistake. All the while, LB had, in fact, not been issued any money.

Subsequently, LB wired $3,500 to Account 1 as directed by the call center operator.

Subsequently, on March 8th, 2019, Defendant Kumar via text message sent AB a photograph of an outgoing wire transfer form indicating that $3,500 had been wired to Account Number 1 from LB's account; and approximately 17 hours later Defendant Kumar via text message to AB inquired about the status of the wire transfer.

Moving now to a separate date. On or about August 8th, 2019, AB, who was located in Rhode Island, offered to provide money routing services to Defendant Kumar and sent him a text message containing bank name, account number, routing number and address for Account Number 2, another bank account that was being used for money routing.

On or about August 9th, 2019, one of Defendant Kumar's co-conspirators, a call center operator, offered PS, that's an acronym for another victim, PS who had earlier been led to believe that his computer had been infected by malware a refund for previously obtained computer services.

That call center operator then obtained remote access to PS's computer and misled PS to believe that an amount well in excess of the refund amount had

mistakenly been sent to PS's account. Subsequently, PS wired $5,000 to Account Number 2 as directed by that call center operator.

On or about August 9th, 2019, Defendant Kumar via text message sent AB, who was in Rhode Island at the time, a photograph of an outgoing wire transfer form indicating that $5,000 had been wired to Account 2 from PS's account.

On August 19th, 2019, AB, who was in Rhode Island at the time, received a telephone call from Defendant Kumar; and he specified that he had a lead on getting $50,000 but would not be able to pursue that lead until he received payment for the $5,000 that had been sent to Account Number 2.

Subsequently on August 19th, 2019, AB, who again was in Rhode Island at the time, contacted Defendant Kumar via text message and requested the customer ID in case the bank asked questions, and Defendant Kumar responded via text message with victim PS's name and home address.

Moving to another date, August 12th, 2019, Defendant Kumar texted AB, who was in Rhode Island at the time, credit card information for RG and RW, two other victims.

Additionally, information had been collected and

compiled with the assistance of -- excuse me, that credit card information had been obtained and collected and compiled with the assistance of other co-conspirators; and it included the accountholder's name, credit card number, expiration date and the three-digit security code associated with the credit card.

Defendant Kumar specified that all of that information had been obtained through his, quote, "pharma business."

Later on August 12th, Defendant Kumar transmitted to AB a data file containing credit card information for 13 separate credit card accounts, all information that had been collected and compiled with the assistance of other co-conspirators and that included the amount previously charged on the accounts from mail order pharmaceutical products and also included the cardholder's name, address, credit card number, expiration date and three-digit security card -- security code.

On August 15th, AB, who was in Rhode Island, texted Defendant Kumar and advised him that attempts had been made to charge small test amounts to some of the credit card accounts but the charges were declined.

Defendant Kumar responded that those credit card

accounts were six months old. Mr. Kumar specified that he had previously charged those accounts for acquisition of pharmaceutical products by the accountholders, and he advised that additional credit card accounts would be transmitted to AB shortly.

A short time later, still on August 15th, the Defendant Kumar transmitted to AB two data files. These two data files contained credit card information for 28 separate credit card accounts, all information that had been collected and compiled with the assistance of other co-conspirators and included the amounts previously charged on the account for mail order pharmaceutical products and also included the cardholders' names, addresses, credit card numbers, expiration dates and three-digit security codes.

Those two data files included the credit card information for RF and TB, both of whom were Massachusetts residents and both of whom within the last year purchased pharmaceutical products online using their credit cards.

On August 22nd, 2019, AB called Defendant Kumar and advised that two of the credit cards had been successfully charged, and Defendant Kumar inquired when he would be getting the money.

AB asked whether there was any risk of the

credit cardholders connecting the recent charges to Defendant Kumar's pharmaceutical business, and Defendant Kumar responded that he was not concerned because the pharmaceutical charges had occurred about a year ago.

Those are the additional facts and specific facts that the Government's evidence would establish were this matter to have gone to trial, your Honor.

THE COURT: Thanks, Mr. Shah.

Mr. Kumar, you heard the elements of the seven counts that the Government has brought against you. I again remind you they would have to prove each and every one of those elements beyond a reasonable doubt in order for you to be found guilty of all or any of those charges.

You also heard the facts the Government would prove if this case were to go to trial. Do you admit the facts as stated by the Government as true?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Kumar, before I ask you about your change of plea, do you have any questions for the Court or are there any matters that you want to discuss with your attorney?

THE DEFENDANT: No, sir.

THE COURT: How do you now plead to the seven

counts contained in the Information brought against you, guilty or not guilty?

THE DEFENDANT: (Indecipherable). Guilty.

THE COURT: This Court has heard from the Government the evidence it would present if this matter had gone to trial.

(Court Reporter requests clarification)

THE COURT: Mr. Kumar, did you say guilty?

THE DEFENDANT: Yes, sir.

THE COURT: Let me repeat. The Court has heard from the Government the evidence it would present if this matter were to go to trial. The Court has questioned the Defendant regarding his understanding of the nature of the proceedings and the consequences of entering a plea of guilty to the charge.

It is, therefore, the finding of this Court in the case of the United States versus Manish Kumar that the Defendant is fully competent and capable to enter an informed plea, that the Defendant is aware of the nature of the proceedings and the consequences of his plea and that the plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the charges; and, therefore, the plea is accepted, and Mr. Kumar is now adjudged guilty of those offenses.

Sentencing will be set down for January 20th, 2021, at 10 a.m. January 20th, 2021, at 10 a.m.

Mr. Shah, anything further for the Government?

MR. SHAH: Nothing further. Thank you, your Honor.

THE COURT: Okay. Great.

Mr. Barrett, anything further for Mr. Kumar?

MR. BARRETT: Your Honor, for the Court, would it be possible to have expedited sentencing? I understand it takes some time for the PSR to be completed, but I would be grateful and so would Mr. Kumar if we could do expedited sentencing.

THE COURT: Sure. What I'll do is I'll ask Vickie to let probation know that we've requested that they quickly prepare the presentence report and get it to us.

As soon as it comes in and after the time for objections to it is done, if -- Mr. Barrett, if I can put it on you once that happens, if you can just contact the Court, obviously check with Mr. Shah first to see if it's okay with him, but we can then move it up once we have the final presentence report.

MR. BARRETT: Thank you. I appreciate it.

THE COURT: Okay. Sure. And we'll ask probation if they're able to do that.

Okay.  Mr. Kumar, take care of yourself, be careful in there with the virus and all, and we'll see you again shortly.  Thanks, everybody.

(Adjourned)

* * * * * * * *


C E R T I F I C A T I O N


I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


___January 18, 2021_____

Date



/s/ Karen M. Wischnowsky_____

Karen M. Wischnowsky, RPR-RMR-CRR
Federal Official Court Reporter