UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

v.

MANISH KUMAR

Criminal Case No. 20-CR-89-JJM

## GOVERNMENT'S SENTENCING MEMORANDUM

Investigation established that Defendant Manish Kumar served as a key participant in a fraud scheme.  For his participation and furtherance of the scheme, the Government recommends a 39-month term of incarceration and restitution as set forth in paragraph 80 of the Presentence Investigation Report ("PSR").  The Government arrives at 39 months by adding 15 months, the low-end of the Guidelines range for Counts 1 through 5, and 24 months, the mandatory, consecutive term triggered by Counts 6 and 7.  Elaboration of the scheme's three component parts demonstrates how a 39-month term accounts appropriately for the sophistication of the scheme, Kumar's role, and the harm caused.

First, in the tech fraud component of the scheme, Kumar obtained telephone call traffic from the publishers of misleading and deceptive internet pop-up advertisements and had that call traffic routed to call center operators in India.  The pop-up ads falsely advised viewers that malware had been detected on their computers and urged them to call a number for assistance.  Kumar arranged for that telephone number to route callers to call center operators in India.  The call center operators perpetuated the falsehood that malware had been detected on the callers' computers and leveraged that falsehood to obtain payment for putative computer technical support services.  Those engaged in the tech fraud piece preyed on the trust of those with limit computer sophistication, stole their money, and likely left victims paranoid, confused, and distrusting.

Second, in the refund fraud component, Kumar provided money routing services.  Call center operators would telephone those who had previously fallen prey to tech fraud and offered to refund the fees that they had paid for the putative technical

support services.  The call center operators manipulated the victims into believe that they had accidentally been sent funds well in excess of the refund amount and then urged the victims to "return" the excess funds.  Because no funds had actually been sent to the victims, the money the victims thought they were "returning" was actually their own money.  Kumar provided the avenue by which that money was sent from the victims to the fraudsters.  He provided his coconspirators a third-party bank account in the United States, and the call center operators had the victims wire money to that account.  Kumar then instructed the third-party to distribute money from the account on to Kumar and his coconspirators.  Those engaged in the refund frauds piece, like those engaged in tech frauds, preyed on the trusting, stole their money, and likely left victims paranoid, confused, and distrusting.

Third, in the credit card fraud component, Kumar sought to use utilize credit card data for yet more theft.  Kumar obtained, through his on-line pharmaceutical sales business and with the assistance of co-conspirators, information sufficient to place charges on different credit card accounts.  The information included account holder names, addresses, credit card numbers, expiration dates, and security codes.  Kumar, for the purpose of having the accounts charged, forwarded that information to a government cooperator.  The targets were those who used credit cards for payment in transactions that involved Kumar.  Those engaged in this last piece of the scheme targeted the use of credit cards for on-line transactions, an increasingly routine form of payment in an increasingly routine form of commerce.  It is difficult to guard against this sort of theft.

Through his role in tech fraud and refund fraud, Kumar is known to have victimized at least two people, LB and PS, with respective fraud losses, intended and actual, of $3,500 and $5,000.  Through his collection of credit card data, Kumar sought to steal from 37 accounts.  Had he approached a partner who was not a government cooperator, 37 different people's credit card accounts could have been breached and

charged, without the account holders' knowledge and without any negligence or inattention by the account holders.  In a nutshell, Kumar and his cohort sought to cheat people out of their money by weaponing trust, the lack of computer sophistication, and engagement in everyday transactions.

Defendant recommends an 18-month term of incarceration or time-served.  *See* Def's Sentencing Memorandum (Dkt. No. 25).  The Government notes that the mandatory minimum term of incarceration imposed by Counts 6 and 7 prevents imposition of a sentence of less than 24 months.  Moreover, the offense conduct, as described above, warrants more than 24 months.

Defendant argues that the two-level upward adjustment for abuse of a position of trust under Guidelines § 3B1.3 was applied in error.  *See id.*  Under Guidelines § 3B1.3, a two-level increase is appropriate where the "defendant abused a position of public or private trust… in a manner that significantly facilitated the commission or concealment of the offense…."  Application Note 1 to the provision explains that "'[p]ublic or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)."

Here, Kumar Defendant admitted to the Probation Department that since 2017 he has owned and operated Mihu Private Limited, a company that acted as a third-party middleman for pharmaceutical sales, taking orders from customers online and shipping out prescription drugs.  *See* PSR ¶ 58.  As a middleman, the company presumably had the ordered products manufactured by others, drug makers.  As owner, Kumar had a position of public or private trust.  His discretionary powers were those of an owner.  Furthermore, it was through his business that he obtained the credit card information that was used to perpetuate as aspect of his fraud.  *See id.* at ¶ 13.  He told the government cooperator that some of the credit card information he supplied (1) was linked to "pharma" and (2) was from "merchant pharma cards" that had "been charged

in USD."  Kumar explained that the card information came from "from other call centers" and that he had "charged them," all of which is consistent with a business engaged in the provision of pharmaceutical sales services.  Kumar, from the company he owned, obtained credit card information.  The company Kumar owned obtained the credit card information in the course of selling pharmaceuticals that had been ordered by consumers or others.  The two-level upward adjustment was correctly applied.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorney,

AARON L. WEISMAN
United States Attorney
/s/ Milind Shah
Milind Shah
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  milind.shah@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of February 2021, I filed the above sentencing memorandum using the Court's electronic filing system and thereby made the memorandum electronically available to Defendant's Counsel, Kensley Barrett.

/s/ Milind Shah
Milind Shah
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th FL
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001
Email:  milind.shah@usdoj.gov