IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * * *   C.R. NO. 20-89-JJM
                              *
UNITED STATES OF AMERICA      *
                              *
    VS.                       *   FEBRUARY 11, 2021
                              *   2:00 P.M.
MANISH KUMAR                  *
                              *
* * * * * * * * * * * * * * * *   VIA VIDEOCONFERENCE


            BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

                          CHIEF JUDGE


                      (Sentencing Hearing)


APPEARANCES:

FOR THE GOVERNMENT:   MILIND M. SHAH, AUSA
                      U.S. Attorney's Office
                      50 Kennedy Plaza
                      Providence, RI  02903

FOR THE DEFENDANT:    KENSLEY R. BARRETT, ESQ.
                      Marin & Barrett, Inc.
                      1000 Chapel View Blvd., Ste. 260
                      Cranston, RI  02920

Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
                      One Exchange Terrace
                      Providence, RI  02903

11 FEBRUARY 2021 -- 2:00 P.M.

VIA VIDEOCONFERENCE

THE COURT:  Good afternoon, everyone.  We're here today for sentencing in the case of the United States versus Manish Kumar, Criminal Action 20-89.

Would counsel identify themselves for the record, please.

MR. SHAH:  Good afternoon.  Milind Shah for the United States, your Honor.

THE COURT:  Good afternoon, Mr. Shah.

MR. BARRETT:  Good afternoon.  Ken Barrett on behalf of Mr. Kumar.

THE COURT:  Good afternoon, Mr. Barrett.

Good afternoon, Mr. Kumar.

THE DEFENDANT:  Good afternoon, sir.

THE COURT:  Mr. Kumar, first of all, you can hear me okay?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  So you have a right to have your sentencing done in open court in person; but because of the pandemic, the Court has made the determination that at this time it's not safe for us to gather in the courtroom; and, therefore, we're proceeding remotely via the Zoom platform.

Have you discussed that with your attorney?  I

understand from him that you are waiving any right to appear in person and that you agree that we can proceed via remote Zoom; is that correct?

THE DEFENDANT:  Yes, sir.

THE COURT:  And just so the record's clear, the sentencing is being held publicly.  The notice has gone on our public website; and, in fact, members of Mr. Kumar's family and the public are entering -- have entered the Zoom hearing and are observing.

Mr. Kumar, we're going to begin by going through the calculation of the advisory guideline range.  Those are guidelines that help the Court determine the appropriate sentence.

We'll see if there are any objections that are going to be pressed.  If so, I'll rule on those objections.  Then once we have the guidelines set, then the Government will make its sentencing recommendation, your lawyer will make his sentencing recommendation. You'll then be allowed to speak if you want to or not, it will be totally up to you, and then I'll get on with the business of sentence.  Okay?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  So the guidelines are calculated as follows:  For Counts I through V, which are the conspiracy to commit wire fraud charges, the

base offense level is seven.  There's four points added because the intended loss amount here was calculated at $27,000, which falls between 15 and 40 thousand dollars, for a four-point addition.

There's two points added.  The offense was committed through mass marketing, which was done here through the utilization of pop-up ads to solicit large numbers of individuals through the internet.

There's two points added if a substantial part of the fraudulent scheme was committed from outside the United States as it was here, that being in India.

There are two points added if the Defendant abused a position of public or private trust.  Here probation has posited that Mr. Kumar owned and operated an online pharmaceutical company.  Through that position as the owner of the company, he used credit card information provided by customers for his own fraudulent means leading to two additional points.

That makes an adjusted offense level of 17. There's a two-point reduction because Mr. Kumar has accepted responsibility for the crime.

And, Mr. Shah, the Government wishes to make a motion on the third point?

MR. SHAH:  I do, your Honor, please.

THE COURT:  Great.  That will be granted for a

total offense level of 14.

Counts VI and VII are the aggravated identity theft.  They don't have a guideline range, but they come with a mandatory required 24 months of incarceration to be served consecutive to whatever sentence is imposed for Counts I through V.  Mr. Kumar has no criminal history, therefore no criminal history points.

So a total offense level of 14, Criminal History Category I, comes with a period -- recommended period of incarceration of 15 to 21 months plus the 24 months added for the aggravated identity theft.

Mr. Shah, any objection to the guideline range or to the PSR?

MR. SHAH:  No objection, your Honor.

THE COURT:  Thank you.  Mr. Barrett.

MR. BARRETT:  Thank you, your Honor.  Yes, we do have an objection to the PSR and particularly to the two-level enhancement for utilizing a position of public or private trust.

The reason for this objection, as I noted in my sentencing memorandum, largely is due to three different points.  The first point is, in reviewing Application Note 1, a public or private trust refers to a position of public or private trust characterized by

professional or managerial, substantial discretionary judgment that is ordinarily given considerable deference.

Your Honor, our argument today with respect to the public or private trust is that Mr. Kumar's role in this scheme did not necessarily rely on a position of public or private trust.

What I mean by that is, in his role, assuming that he was acting in the capacity of his job as the company that was providing the prescription drugs to American citizens, I don't think the evidence has shown that he was acting in that capacity as a representative of his company.

I do believe that in the evidence or the discovery that was supplied by the U.S. Government, there was some ambiguity as to whether or not he was utilizing the information that came from his company.

There were some call centers that my client, Mr. Kumar, by some means had obtained this credit card information, but I don't believe that it necessarily came from his company.

Even assuming that it did come from his company, meaning the company that he was part owner, I still do not believe that that constitutes a position of public or private trust.

What I mean by that is, in reviewing Application Note 1, it characterizes a position of public or private trust as a relationship between an individual, namely an attorney or client or a doctor and a patient or a clergy member with a parishioner.  That seems to be the kind of relationship that is discussed in terms of a public or private trust.

The situation in Mr. Kumar's case, assuming that he was acting as a representative of the company, doesn't quite fall into that category.  I would say --

THE COURT:  Mr. Barrett, can I interrupt you and ask you why not other than the fact that it doesn't seem to fit in the examples?

In other words, you don't -- you wouldn't say that a merchant/consumer relationship when the consumer turns over their credit card information to the merchant is doing so in a trustful relationship, that it will be used for the purpose to which you're giving it and that that merchant/customer relationship isn't considered one of private trust?

MR. BARRETT:  Your Honor, I wouldn't necessarily go that far.  I would say that in the situation in which you described a merchant that was regulated within the United States would have much more of a stronger footing that a merchant that could be

somewhere overseas or what have you.

I understand that there's not quite a bit of a difference there because it is a public -- it is a private merchant or private entity.

I also note if it rises to that particular level, I do think there's some attenuation between an individual going online and ordering a product overseas than it would be someone ordering from a local Walgreen's down the street.

THE COURT:  I hear you, Mr. Barrett, but I'm not going to -- I'm going to overrule the objection.  I think that when this type of fraud is committed, it, in fact, is centered around trust; that the victim on the other end does these things, which some might call stupid, because they trust the person on the other end because of the relationship that's involved there where they freely give over information or they respond to a pop-up or any of those matters.

I think that's, on all fours, a trust relationship that is violated sufficient that the two points get added.

MR. BARRETT:  Your Honor, I respect that.  One last argument, and I understand that the Court has made its ruling.  The way I understood it is that the Government is positing that the public trust was

violated through the use of credit card information; and the reason I was making the argument is not to diminish the seriousness of the offense, but it seemed to me that providing these prescription drugs and obtaining credit information from individuals for an activity that is essentially outlawed by the United States Government seems to be, again, a little bit of a stretch that there's trust involved.  To me, it would be akin to buying drugs from a drug dealer and that trust got misused.

THE COURT:  I don't buy that, Mr. Barrett.  You make really good arguments.  I would make them if I were in your position, but -- and I respect that, but I'm not buying that for a variety of reasons.

One is, you know, maybe then drug dealer and drug user is a relationship of trust.  I don't know that I can reach that; but there are many, many people in this country that turn overseas, albeit potentially illegally, to buy lower-priced prescription drugs, and I don't think their level of trust in the merchant is any different.

I know many elderly people that take the trip up to Canada and do it for the thing.  So I hear you, but I'm overruling that objection.

MR. BARRETT:  Thank you, your Honor.

THE COURT:  Any other objections?  Okay.  The Court's accepting the guideline range as stated in the PSR and accepting the PSR as stated, and I'll hear from the Government on its recommendation.  Mr. Shah.

MR. SHAH:  Your Honor, the Government in some detail has set forth its recommendation and its position for its recommendation in the sentencing memo submitted to the Court.

The recommendation is 39 months.  That's the low end of the guidelines.  It's the low end primarily to recognize that Mr. Kumar has pled, he's accepted responsibility and this case proceeded by way of an Information.

But none of that suggests or is meant to suggest that the activity at issue is being minimized.  The activity at issue is, in our modern culture, a way of weaponizing trust, a way of attacking the way ordinary consumer transactions occur.

The fraud is extensive in the sense that it has three components.  The first is tech fraud, something that the Court may be familiar with, but basically pop-up ads coming on one's computer.

The pop-up ads lie in that they say that viruses have been detected on the user's computer.  The user, in turn, calls a number.  It's connected to a call

center.

Mr. Kumar was critical in that process because he was the conduit that connected the phone numbers to the call center in India.  A phrase that many telemarketing call fraudsters use to describe this role is, he was a middleman.

That doesn't minimize his conduct.  He was a middleman in that he was a necessary conduit to link that number to the call center.  He made money by selling call traffic to call centers.  Without middlemen like Mr. Kumar, the connection doesn't happen.  That's Phase I.

Phase II of the fraud is refund scams.  Refund scams are where these people who have been victimized by tech fraud get called by a call center and are told, Oh, we're giving you a refund for the money you paid for a previous fraud, namely the technical support we supposedly provided you.

Here the person called is misled to believe that somehow an overage has been refunded.  In fact, no money is refunded, but the victim is led to believe that an overage is refunded and is led to remit, they think, money to the call center.

Here Mr. Kumar is again a vital component in that he provides a money conduit.  He provided an

account that the call center could provide the person it called directing the person who's called to route money to the account that Mr. Kumar has provided.

That account is a third-party account here in the United States.  Money was intended to be diverted from that account off to Mr. Kumar and then later to the call center through Mr. Kumar.

And then finally there's an effort to yet seek another way to make money off of -- basic of the way financial transactions, consumer transactions, are conducted in the United States and elsewhere, namely the use of credit cards.

Mr. Kumar was able to collect credit card information sufficient to charge credit cards, and he passed that information along hoping to make money by pushing false bills onto those credit cards.

What's noteworthy about Mr. Kumar's conspiracy as well as the actual incidence of fraud is, it's a full wrap-around scheme.  It's attempting to attack consumers in every plausible handhold, in every plausible way that it can.

It's not just Mr. Kumar.  It's also his co-conspirators; but the gravity of the conduct is, it's not merely enough to go after people through tech fraud.  There's a new way to get even more money out of

them, refund fraud.  It's not enough to get just the tech fraud and the refund fraud money.  We're now going to attack the use of credit cards and try and bilk consumers out of even more money.

This sort of conduct undermines consumer confidence, and I don't mean that in an economic sense. I mean that in the sense of individual consumers, and we've seen this in other cases in older individual consumers.  A paranoia develops in terms of relations with people by phone, ordinary relationships that most rely on, providing credit cards to people you trust in transactions, talking to people by phone to seek assistance.  These relationships are undermined. Confidence is undermined.  It tends to have a dire impact on the victim.

It's for all of these reasons that the Government is recommending 39 months, your Honor.

THE COURT:  Mr. Shah, can I ask you, the intended loss amount seems low to me in this case.  You and I have had seven or eight similar type scheme cases over the last year or so, I think.  The number's low. Am I wrong?  It seems low.  Am I wrong on that?

MR. SHAH:  You're not wrong.  However, some of the number being low is a function of how the guidelines operate in this type of case.

There was intended fraud on these credit cards, namely the credit card accounts, 37 of them which were, at the time the accounts were shared, operative, active accounts, not expired accounts.

Because it was an attempt or a scheme to try but there wasn't actual billing done on the cards, the guidelines limit the fraud loss on each card to $500.

Had there been an effort, had there been intrusions, we might assume that there would be an attempt to get to the credit limit on each card, which would severely raise the fraud loss; but the low number, I would submit to the Court, is partly a function of the posture of the fraud in this case. Namely, we caught it before there were actual bills submitted on the account because we sat in the driver's seat because he was communicating with a Government cooperator.

THE COURT:  And what about the other fraud, the pop-up and the refund, did that not produce more money or did Mr. Kumar just get caught quickly or is it a negotiated issue?

MR. SHAH:  We were able to -- I want to be very careful about relying only on what our investigation revealed, but we were able to get an insight into Mr. Kumar's activities because we had the services of a

cooperator.

So we were able to look at Mr. Kumar's activities for a year-long period, and we were able to siphon certain transactions through the cooperator.  In that way we were able to get insights into Mr. Kumar's behavior.  Could there have been others, there may have been; but I don't have information about them.  That's one.

Two, with respect to these particular victims, we were able to catch them in the fraud cycle where they were being subjected to the refund fraud piece of things.

We, through talking to them, ascertained that they had been victimized by tech fraud; but we couldn't put a number on the tech fraud in part because the tech fraud occurs before, some of them may not have known they had been bilked or they didn't keep records of how they were bilked or they may not have been present enough to keep track of that information.

That is the sum of it, your Honor.

THE COURT:  Okay.

MR. SHAH:  I will say that your Honor saw another case where it wasn't attempts on credit cards, it was attempts on actual bank accounts; and in that case, the guidelines -- the intended loss amounts could

be argued to be the amount of money in the bank.

It operates differently with credit cards.  When there isn't an actual charge foisted on the card, you don't get to assume the credit limit of the card.  You only get to assume $500, your Honor.

THE COURT:  Thanks, Mr. Shah.

Mr. Barrett.

MR. BARRETT:  Thank you, your Honor.  I want to start off by saying that we're here today because my client has been convicted of the seven counts that he faces.  Let's face it, he is guilty; and he has come clean, so to speak.  He's admitted his guilt.

I do think it's worth noting, as the U.S. Government pointed out, that my client was a middleman throughout each of these schemes; and I think it's important to also note that there's been no evidence to suggest that my client even benefits financially from these schemes.

I do believe the U.S. Government had my client's cellphone, went back over years looking at all the records and speaking with the co-conspirators.  I don't believe there's been any evidence that has been shown that my client financially benefited from these schemes.

Not to diminish his culpability or

responsibility for these frauds, but I do think it's notable that throughout all of this, he didn't receive any money, at least as has been shown by the U.S. Government.

Now, in addition to that, I think it's also important to note that, at least the evidence as has been presented, these instances of fraud take place over a limited amount of time.

I do believe that the first noted instance of fraud occurred in roughly April or March of 2019. There were at least two instances where there were pop-up and tech fraud that amounted to an actual loss of 8,500, 5,000 of which was returned to the -- or $3,500, excuse me, was returned to the actual victim and then the $5,000 restitution amount that's outstanding.

So we fast forward from that April, March 2019 point to August 2019, and I think it's important to note that nothing is happening in those summer months. There's been no activity, at least that the evidence has shown, that there's been any fraud that was ongoing during that timeframe.

But, interesting enough, at the beginning of August 2019, a co-conspirator, at the direction of the U.S. Government, reaches out to my client; and my

client, out of a morbid sense of loyalty and perhaps greed, provides the information referencing the 37 credit cards that's in the PSR report.

And it was only at the direction of the co-conspirator that my client provides the information, which ratcheted up his intended loss from what it would have been, the smaller amount, to the amount just under $40,000.

Now, again, none of this diminishes my client's culpability or responsibility or any of that; but I do think that it's important to note that the scope of the scheme, the duration was roughly March 2019 to August 2019.  And on these handful of occasions, my client did admittedly commit these crimes; but, again, it's important to note that he did not benefit financially from these schemes.

And also I think it's important to note that there were victims, as the U.S. Government points out. It does raise concerns that elderly people or older people might lose faith in relying on using a technology to obtain things; but I do think in this particular matter the victims were limited to the two individuals who actually suffered losses, the $5,000 to one victim and the $3,500 to another victim.

Aside from all of that, I do believe that my

client has certainly suffered significant collateral consequences for his crimes.  As I mentioned in the sentencing memorandum, he was coming to the United States with his wife of a year at which time he was taken into custody at the JFK airport.

And since then, he has been detained here in Massachusetts for the last 18 months with virtually no contact with any of his family who was even aware that he had been -- he came to the United States until after his wife reluctantly told the family after multiple times of asking where he's at.

I do think and believe that if there was a time machine and Mr. Kumar could go back in time and understanding, not due to the fact that he got caught, but understanding the ramifications of his actions, he would not have taken those actions.

Albeit that's obviously impossible, but I do think that Mr. Kumar has certainly suffered and will continue to suffer even after today's sentencing hearing.

Certainly his reputation is tarnished.  As I mentioned in the memorandum, it has caused severe marital strain to the extent that his wife has talked about divorce; and his family has been estranged from him over the last 18 months, the family that relied on

him for economic support.

Now, it's easy to say that my client did this out of greed, but I do think there's more to it.  I do think there was a morbid sense of loyalty to one of the Co-Defendants who he foolishly provided information at his own peril.

Therefore, your Honor, I do believe that, based on 18 U.S.C. 3553, that there are other ways to address Mr. Kumar's punishment instead of being within the guideline range.

I do think that there is a chance of Mr. Kumar to redeem himself; and I do think that he's a young man, 32 years old, has risen from poverty to become something in India.  I do believe that he'll have the opportunity to make something of himself when he returns to his country.

I do not believe, respectfully, that additional jail time to the tune of 33 or 35 months serves any point beyond which he's already suffered.  It would serve for deterrence to other would-be individuals who might commit crimes such as this; but I also think that Mr. Kumar's case and other cases similar to his within the state of Rhode Island have gained notoriety and public attention about individuals who are being imprisoned for similar types of crimes.

So if we're looking for a deterrent effect, I do believe that his situation and others have certainly made its mark; and I honestly think that in Mr. Kumar's situation additional jail time beyond or within the guideline range will certainly be piling on as opposed to serving any real, let's say, effects.

Therefore, your Honor, I do submit that a period of incarceration at the mandatory minimum of 24 months seems to be more appropriate. I did put in my memo that we're looking for time served, but I understand that there's a mandatory minimum that certainly handcuffs your Honor; and I would respectfully request that a term of 24 months would be more appropriate given my client's contrition and the collateral consequences he's already suffered. Thank you, your Honor.

THE COURT: Thanks, Mr. Barrett.

Mr. Kumar, do you want to say anything before I impose sentence?

THE DEFENDANT: With all due respect, sir, I just want to say I'm sorry for whatever I have done, and I'm -- I take the full responsibility for all my wrongdoings and all my conducts; and if provided an opportunity, I would like to ask any of my victims who have suffered any kind of loss to forgive my conduct.

And I would also like to say, like, sorry to my family; and because of me being here, they have suffered the most because I was the one that was, like, providing them with everything; and they have to be ashamed from their society because of my conduct and because of my wrongdoings.  So I'm really sorry, and I hope they can forgive me.

And I would also like to say, like, sorry to my wife because me being locked up here for so long. She's like -- she's almost about to go to, like, give me, like, divorce.  If I get, like, time served, if my wife wants to get divorced, I can go and try and fix my marriage and try to have, like, a normal life.

And I'm really sorry, once again, for whatever I have done; and I'll make sure and I promise I will never do anything wrong in the future, sir.

THE COURT:  Thanks, Mr. Kumar.  When a Court sentences someone for committing a crime in this country, the laws require us to consider two things: The history and characteristics of the person, we look at the person who committed the crime, and then the seriousness of the crime.

And then we have to impose a sentence that punishes people, deters the individual, deters the public so that they know we take it seriously, that

promotes respect for the law, that calls for rehabilitation and other factors; and then ultimately we decide on a sentence that is sufficient but not more than necessary to do all that.  So that's what a Court has to think about when it comes to what an appropriate sentence here is.

Let's start with the seriousness of the offense. It is incomprehensible to me, to be honest with you, Mr. Kumar, how someone can fraudulently take advantage of people financially because it's my belief that the people that fall for those schemes and get subjected to that are vulnerable people.

Now, maybe not in the legal sense that we consider it here, but it means that they're not potentially highly educated, they're not well off. People that fall for this scheme sometimes are in a pretty tough place in society, and how someone could take advantage of those people I will never understand.

And it's got to be that you don't think about it.  You don't think about the people on the other end and what it does to their life when your identity is stolen and your credit card is taken and used or when you find out what it does to you, when you find out that someone got you to give them $1,000 on a fraud. It just goes to the core of human behavior that I don't

understand, and that's what I look at on the crime that you committed here.

So it's very serious.  And as you heard me say to Mr. Shah earlier, I think you heard me or maybe it was beforehand, I think this is the seventh or eighth or ninth scheme like this that I've seen in the last year where I've had to sentence people for it.  And so the need to deter the public is also a big factor, more so than it is in many other kinds of cases.

I then look at you, the person, the history and characteristics of you; and I note that you're 32 years old, and from what I understand -- I mean, I know you have no record that we know of.  I assume that you've otherwise led a law-abiding, decent life.

I look at someone who had to leave school after high school to help take care of your family, and I think Mr. Barrett described your family as not well off.  I see you took on some responsibility for that, and I don't see any evidence at all that you were living a greedy lifestyle by any stretch of the imagination.

And so it's hard to figure out what you do in those cases where you've got a real serious crime, right, and you've got a person who, you know, you're a first-time offender.  I don't know if you'd ever do

this again or not.  I have no idea if this is one of those stupid mistakes that people make and it will never happen again.  I don't know.  I don't know.

But I do know that 24 months in jail is a very long time for someone in a different country serving away from home who's a first-time offender; and I believe that a total of 24 months covers all the things that we have to, to punish you, to deter you, to help with rehabilitation and to earn respect for the law in that regard; and I think 24 months is sufficient but not more than necessary in order to do that.

So the Court's going to impose, as to Counts I through V, a sentence of time served and, as to Counts VI and VII, 24 months concurrent to one another and consecutive to Counts I through V.

A fine is not appropriate given your financial position, but the Court will impose the $700 mandatory special assessment.

I will award $5,000 to Mr. Paul Sekular in restitution as set forth in the presentence report and will impose a period of one year of supervised release just with the standard conditions.

Mr. Barrett, is there a plea agreement?

MR. BARRETT:  There is not, your Honor.

THE COURT:  Okay.  So, Mr. Kumar, you have a

right to appeal the sentence I just imposed on you.  If you choose to appeal the sentence, you can do so without the payment of fees by just requesting to proceed in forma pauperis.

If you want an attorney to represent you for the appeal, the Court will appoint one for you if you can't otherwise afford it; and our Clerk of Court will assist you in filing an appeal if you ask them.

The important thing to know is if you wish to appeal the sentence I just imposed, you have to do so within 14 days of the entry of the judgment on the record.

Do you understand your appellate rights and deadlines?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Ms. Picozzi, anything further for probation?

THE PROBATION OFFICER:  No, your Honor.

THE COURT:  Thank you.  Mr. Shah, anything further for the Government?

MR. SHAH:  No.  Thank you, your Honor.

THE COURT:  Before I -- one other thing I didn't add is, and I may be wrong on this, but in my mind for similar type cases, and if I'm wrong, I'm sure Mr. Shah will show me at another time that I am, I think that 24

months total is approximately the same sentence I've given to others.  So in addition to not having disparate sentences, that was another factor that the Court calculated.

Mr. Barrett, anything further for Mr. Kumar?

MR. BARRETT:  No.  Thank you, your Honor.

THE COURT:  Okay.  Mr. Kumar, I wish you well. I hope your lawyer is right that this is a one-time mistake that you made and that you will go home, take care of your family and live a lawful life and spread the word that no one should do what you did before because there will be serious consequences.

THE DEFENDANT:  Yes, sir.  I'll make sure.

THE COURT:  Okay.  Stay safe, Mr. Kumar, and safe travels.  With that, we will stand adjourned. Thank you, all.

(Adjourned)

C E R T I F I C A T I O N


        I, Karen M. Wischnowsky, RPR-RMR-CRR, do
hereby certify that the foregoing pages are a true and
accurate transcription of my stenographic notes in the
above-entitled case.


                April 13, 2022
                Date



                /s/ Karen M. Wischnowsky
                Karen M. Wischnowsky, RPR-RMR-CRR
                Federal Official Court Reporter